**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Criminal No. 3:21-CR-41 (CJN)** |
| | : | |
| **DOUGLAS SWEET,** | : | |
| | : | |
| *Defendant.* | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the Acting United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence defendant Douglas Sweet to three months of home detention as part of a probationary term of three years, 60 hours of community service, and $500 in restitution.

### I.   Introduction

Sweet participated in the January 6, 2021, attack on the United States Capitol – a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured over 100 law-enforcement officers, and resulted in over $1.4 million worth of property damage.

Sweet stands before this Court to be sentenced on a misdemeanor conviction, but his conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt the proceedings.  But for his actions alongside so many others, the riot likely would have failed.

The government is requesting a three-month term of home detention and probation based on an assessment of the relevant sentencing factors. Sweet admitted in a post-Capitol breach interview that he traveled to Washington, D.C., hoping to "talk to the House and Senate" and realized he might have to "pretty much force [his] way in." He entered the Capitol and remained inside until he was arrested, despite glaring evidence of a violent riot all around him, including a raucous crowd, an individual he photographed breaking in through a window, rioters fighting with and hurling chairs at police officers, and litter strewn about the Capitol floor. At the same time, he consented to two voluntary interviews with the Federal Bureau of Investigation ("FBI") and consented to a search of his cellphone and social-media pages after his arrest on federal charges.

## II.   **Factual and Procedural Background**

### *The January 6, 2021, Attack on the Capitol*

To avoid exposition, the government refers to the general summary of the attack on the Capitol in ECF No. 84, at 1-3. As this Court knows, a riot cannot occur without rioters, and each rioter's actions—from the most mundane to the most violent—contributed, directly and indirectly, to the violence and destruction of that day.

### *Sweet's Role in the January 6, 2021, Attack on the Capitol*

Sweet traveled with his friend Cindy Fitchett from Virginia to attend the rally President Donald Trump planned to hold in Washington, D.C. on January 6, 2021. After arriving in Washington, he and Fitchett made their way to the Capitol.

On January 6, 2021, at approximately 2:25 p.m., Fitchett recorded a video of herself, wearing a bright orange windbreaker and red knit hat with "TRUMP" stitched on it, and Sweet, wearing a black hat and bright yellow shirt, approaching an entrance into the Capitol with a large, raucous crowd around them yelling and making banging noises. Fitchett, with the camera turned

on herself, stated in a raised voice, "We are storming the Capitol.  We have broken in.  Patriots

arise.  Woo!"  These screenshots from the video depicted Fitchett and Sweet:



The video also depicted Sweet making a pointing gesture toward the nearby entrance.  Sweet also

took this cellphone photo of a rioter (circled in yellow) breaking into a window near that entrance:



Shortly after taking this photo, Sweet and Fitchett unlawfully entered the Capitol.  Once inside, Sweet took a couple selfie photos, one of himself and Fitchett, and another of only himself:



Around the time Sweet entered the Capitol, U.S. Capitol Police ("USCP") officers had already been under attack by rioters outside the building and fell back to a makeshift recovery area they had established in the Capitol Crypt. Before long, rioters also breached that recovery area, and began throwing objects and unknown liquid substances at the officers. The officers retreated down a stairwell to the Capitol Visitor Center ("CVC"), which is also part of the Capitol. Some rioters threw chairs at the officers. At approximately 2:30 p.m., surveillance video captured officers retreating down the stairwell as chairs tumbled behind them. The officers then drew back to the end of a corridor in the CVC that led to an atrium on the House of Representatives side of the building.

Surveillance video depicts Sweet and Fitchett walking down the stairwell where the officers retreated at approximately 2:31 p.m. As they descended the stairwell (circled in red), a rioter in military fatigues wielding a baseball bat at the base of the stairwell (circled in green) appeared to exhort individuals to proceed downstairs, and chairs lay strewn about the CVC's floor (circled in yellow), as depicted in these sequential screenshots:







At approximately 2:33 p.m., surveillance video captured Sweet and Fitchett walking toward the end of the corridor where USCP officers had formed a defensive line, as depicted below:



Other rioters also gathered in this corridor.  The officers issued commands for the rioters to leave the building.  Sweet contended he did not hear those commands.  At approximately 2:39

p.m., when rioters refused their commands, the officers began arresting individuals who had unlawfully entered the building, including Sweet and Fitchett.

The FBI uncovered no evidence that Sweet engaged in violent conduct at the Capitol grounds or inside the building.

Following the attack on the Capitol, Sweet gave a January 7, 2021, interview with a local news station in Virginia, during which he stated he traveled to Washington, D.C., hoping to "talk to the Senate and the House and actually speak" and realized he might have to "pretty much force [his] way in." But he also stated, "I did not go with any malice or intention of malice. Those that committed those—the fights—the tear gassing, . . . throwing stuff at police, that wasn't in my game plan at all." According to the news report, Sweet said he was not trying to stop the electoral certification, but wanted his voice heard. The reporter asked him, "Do you understand you cannot voice your concerns by barging into the Capitol building?" Sweet responded, "Well . . . what other recourse do we have? They will not listen to us." When the reporter asked him if he had any regrets about breaching the Capitol, he did not appear to express any. His response was, "From our actions come reaction."[1]

Sweet cooperated with law enforcement following his rearrest on federal charges on January 13, 2021. He gave a voluntary post-arrest interview with the FBI that day and consented to a search of his cellphone. He also voluntarily provided his password and screenname so law-enforcement authorities could search his Facebook page.

During his post-arrest interview, he admitted taking one or two selfies after he entered the Capitol, and seeing trash strewn about the Capitol floor and "chairs thrown everywhere," which

---

[1]  The news report, including excerpts from a video interview of Sweet, is available at https://www.wtkr.com/news/mathews-co-man-arrested-during-capitol-riot-trump-asked-all-the-patriots-to-show-up-so-i-did.

he found "disheartening."  According to Sweet, he admonished other rioters to "keep them from tearing up stuff."  He acknowledged seeing "people fight with police."  He said he proceeded to a "hallway" and met with police there.  When a police officer asked Sweet what his intentions were, he said he wanted to go "to the Senate and the House and address them."  The officer said he could not do that.  Sweet asked the officer what his "recourse" was.  The officer replied, "you could come in here and talk."   Sweet said he was fine with that, but when he stepped behind the police line, he was arrested.

Sweet knew at the time he entered the Capitol that he did not have permission to enter the building, and did so with the intent to impede, disrupt, or disturb the orderly conduct of a session of Congress.

*The Charges and Plea Agreement*

Sweet was initially arrested at the Capitol on January 6, 2021, and issued a summons to return to D.C. Superior Court.  On January 7, 2021, Sweet was charged by complaint with violating 18 U.S.C. § 1752(a) and 40 U.S.C. § 5104(e)(2).  On January 13, 2021, he was rearrested on the federal complaint in Virginia.  On January 15, 2021, he was charged by an initial information with four misdemeanor counts.  On January 21, 2021, Sweet was charged by an Amended Information with four counts, violations of 18 U.S.C. §§ 1752(a)(1) and (2), and 40 U.S.C. §§ 5104(e)(2)(D) and (G).  On August 10, 2021, he pleaded guilty to Count Four of the Amended Information, which charged a violation of 40 U.S.C. § 5104(e)(2)(G).  In his plea agreement, Sweet agreed to pay $500 in restitution to the Department of the Treasury.[2]

---

[2] The actual payee of the restitution should be the Architect of the Capitol, as indicated in the PSR at 8.

### III.    <u>Statutory Penalties</u>

Sweet now faces sentencing on a single count of 40 U.S.C. § 5104(e)(2)(G).  As noted by the plea agreement and the U.S. Probation Office, he faces up to six months of imprisonment and a fine of up to $5,000.  Sweet must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).  As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559(a)(7); U.S.S.G. §1B1.9.

### IV.    <u>Sentencing Factors Under 18 U.S.C. § 3553(a)</u>

In this case, sentencing is guided by 18 U.S.C. § 3553(a). Some of the factors this Court must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6).

#### A.  The Nature and Circumstances of the Offense

The attack on the Capitol on January 6, 2021, is a criminal offense unparalleled in American history.  It represented a grave threat to our democratic norms; indeed, it was one of the only times in our history when the building was literally occupied by hostile participants.  By its very nature, the attack defies comparison to other events.  So too does the conviction this defendant now faces.  Picketing, demonstrating, or parading at the Capitol as part of the riot on January 6

was not like picketing at the Capitol some other day, without other or with relatively few rioters present.

Indeed, this Court, in considering the nature and circumstances of the misdemeanors charged under 18 U.S.C. §§ 1752(a)(1) and (a)(2) and 40 U.S.C. §§ 5104(e)(2)(D) and (e)(2)(G) for another defendant arrested in the CVC, recognized:

> This isn't a case where the defendant is alleged to have simply trespassed into an empty government building or explored a restricted area in a reckless way. . . . [The defendant's] participation in storming the Capitol on January 6th is far more serious than the statutory offenses charged.  His participation demonstrates disregard for the rule of law, a democratic process, and a peaceful transition of power.

*United States v. Michael Thomas Curzio*, 2:21-cr-0041 (CJN), Tr. 3/9/2021 at 28 (hearing on defendant's motion to vacate detention order under 18 U.S.C. § 3142 *et seq.*) (statement of Judge Nichols).

All defendants should be sentenced based on their individual conduct.  But this Court should note that each individual person who entered the Capitol on January 6 did so under the most extreme of circumstances, and Sweet is no exception. As individuals entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob.  Depending on the timing and location of their approach, they also may have observed extensive fighting with law enforcement—Sweet admitted seeing "people fight with police"—and smelled chemical irritants in the air.  Fitchett's video, in which Sweet appeared, captured the raucousness of the crowd near where she entered the Capitol, as banging and yelling can be heard while she exclaimed, "We are storming the Capitol.  We have broken in.  Woo!" Sweet also took a photo of another rioter breaking into the Capitol through a window.

Additionally, while looking at a defendant's individual conduct, we must assess such conduct on a spectrum. This Court, in determining a fair and just sentence on this spectrum, should

look to a number of critical factors, including: (1) whether, when, and how the defendant entered the Capitol building; (2) whether the defendant engaged in any violence or incited violence; (3) whether the defendant engaged in any acts of destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored, law enforcement; and (9) whether the defendant otherwise exhibited evidence of remorse or contrition.  While these factors are not exhaustive or dispositive, they help to place individual defendants on a spectrum as to their fair and just punishment.

Sweet observed the disarray and disorderly conduct of a riot inside the Capitol building. He admitted seeing trash strewn about the floor and rioters throwing chairs.  He admitted seeing others "tear up stuff."  He claimed he told them to stop, and they "got up and left" shortly after, though undersigned counsel are unaware of evidence corroborating that assertion.  He descended the stairwell to the CVC less than two minutes after USCP officers retreated down those same stairs as rioters threw chairs at them.  Video evidence shows a rioter in military fatigues, wielding a baseball bat, appeared to exhort other rioters to come down that stairwell.  As Sweet and Fitchett got to the bottom of the stairwell, chairs lay strewn on the CVC floor.  The indications were clear that a riot was occurring around him, yet Sweet did not turn back.  He remained in the CVC for approximately eight more minutes until officers began arresting rioters.  Make no mistake, neither Sweet nor any other rioter was a mere tourist that day.

The government has no evidence that Sweet engaged in any violence or destruction of property.   Nor does it have evidence that he attempted to destroy evidence.  He consented to a

search of his cellphone and social-media pages, and submitted to two interviews with the FBI. Sweet was also willing to submit to further discussions with the FBI.

**B.   The History and Characteristics of the Defendant**

As set forth in the Presentence Report ("PSR"), Sweet has one prior criminal conviction for Contributing to the Delinquency of Minor in Mathews County, Virginia, from 2000.  PSR at 9.  Due to the staleness of that conviction, he would likely have zero points if the Sentencing Guidelines did apply to his offense of conviction. USSG § 4A1.2(c)(2).  Accordingly, he would be in Criminal History Category I. USSG §§ 4A1.1, 5A.

The government also notes that from an early point in the case, Sweet, through his attorney, expressed a desire to plead guilty. When recommending an appropriate sentence, the government gives significant weight to Sweet's prompt resolution of this case.  These factors favor a more lenient sentence.

**C.   The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

The attack on the Capitol building and grounds, and all that it involved, was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[3] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases arising out of the riot on January 6, 2021, including misdemeanor cases.  *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-00238 (TFH), Tr. 8/4/2021 at 3 (As Judge Hogan noted, "As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should

---

[3] FBI Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021) (hereinafter "FBI Director Wray's Statement"), available at: https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf.

be that these offenses were an attack on our democracy and that jail time is usually – should be expected.")  Although this specific factor weighs in favor of incarceration, the other factors identified in this memorandum favor a more lenient sentence.

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).  The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.  Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration.  For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the transfer of power.  As noted by Judge Moss during sentencing in *United States v. Paul Hodgkins*, 21-cr-00188 (RDM):

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. 7/19/2021 at 69-70.  Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

The gravity of these offenses demands deterrence.  This was not a protest.  *See id.* at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.").  And it is important to convey to future

14

rioters and would-be mob participants—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

Sweet's admissions about his desire to go to the Capitol to "talk to" the Senate and House, his belief that he might have to "pretty much force [his] way in," and his conviction that he had no "other recourse" but to breach the building are deeply troubling.

Further, Sweet knew his entry into the Capitol was unlawful, and it was evident to him and anyone else there that a frenzied mob had converged on the Capitol and a riot had broken out. All the indications were there for Sweet; he heard the banging and yelling outside the Capitol, photographed a rioter breaking in through a window, saw individuals being destructive inside the building, and observed litter and chairs thrown about the Capitol interior. Despite all this, he proceeded down to the CVC and remained there for about eight more minutes until he was arrested. There is no telling how much longer he would have remained had he not been one of the few individuals arrested inside the building.

At the same time, Sweet's actions at the Capitol were limited, and he was willing to cooperate with law enforcement when he was rearrested in Virginia on January 13. Although the need to deter what happened in general on January 6 favors incarceration, the facts of Sweet's specific case and his subsequent actions favor a sentence more lenient than incarceration, but more restrictive than probation alone.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful-entry misdemeanors, to assault on law-enforcement officers, to conspiracy to corruptly interfere with Congress. Each offender

must be sentenced based on his or her individual circumstances, but with the backdrop of January 6 in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lesser end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021, were not minor crimes.   A probationary sentence should not necessarily become the default.[4]

Indeed, the government invites the Court to join Judge Lamberth's admonition that "I don't want to create the impression that probation is the automatic outcome here because it's not going to be." *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19; *see also United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 ("Judge Lamberth said something to the effect . . . 'I don't want to create the impression that probation is the automatic outcome here, because it's not going to be.' And I agree with that. Judge Hogan said something similar.") (statement of Judge Friedman).

Here, to avoid unwarranted sentencing disparities, the Court should also consider the sentence imposed on Thomas Gallagher, another codefendant arrested in the CVC whom this Court sentenced on October 13, 2021, and the circumstances of Sweet's codefendant, Fitchett, who is set to be sentenced along with Sweet.[5]

---

[4] Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation, including in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); and *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC). The government is abiding by its prior agreement to recommend probation in these cases. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

[5] This Court also sentenced an additional CVC codefendant, Michael Curzio, on July 12, 2021.  Curzio, who received the statutory maximum sentence of six months of incarceration for the same offense for which Sweet has pleaded guilty, is not an apt case for comparison due to Curzio's significant criminal history and because he had been detained for nearly the entire six months.

While it was unclear what time Gallagher entered the Capitol, he appeared in the CVC approximately one minute earlier than Sweet and Fitchett.  The government did not uncover evidence that Gallagher had a political agenda similar to Sweet's of "talk[ing] to" the House and Senate underlying his trip to Washington and breach of the Capitol, and there was video evidence that Gallagher admonished another rioter not to be disorderly.  On balance, the primary difference between these defendants is Sweet's agenda, his lack of apparent contrition in his television interview, and more mitigating evidence in Gallagher's favor. That is why the government requested a shorter term of home detention for Gallagher.  The Court ultimately sentenced Gallagher to two years of probation without home detention, plus additional conditions.

Comparing the circumstances of Sweet's conduct to Fitchett's, the primary difference between the two codefendants is Sweet's explicit political motivation for traveling to Washington on January 6 and ultimately breaching the Capitol.   While Fitchett boasted about "stormin[ing]" and "br[eaking] in" to the Capitol on her video, she appears to have tagged along for the ride to Washington, and the video evidence shows she followed Sweet inside the CVC.  And while Sweet has accepted responsibility for his conduct, he, unlike Fitchett, has not yet expressed remorse.  For these reasons, the government is requesting a greater period of home detention for Sweet.

After a review of the applicable § 3553 factors, the government believes that a three-month term of home detention as a condition of probation, and the agreed-upon restitution, is appropriate.

## V.    Conclusion

Sentencing here requires that the Court carefully balance the various factors set forth in 18 U.S.C. § 3553(a).  As detailed above, some of those factors support a sentence of incarceration, but most of them support a somewhat more lenient sentence.   Balancing these factors, the government recommends that this Court sentence Sweet to three months of home detention as a

term of probation, three years of probation, 60 hours of community service, and $500 in restitution in addition to the mandatory $10 special assessment.  Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his limited criminal conduct on January 6 and his early acceptance of responsibility.  It also allows continued monitoring of Sweet in the event of future participation in similar conduct.

Respectfully submitted,

CHANNING D. PHILLIPS
ACTING UNITED STATES ATTORNEY

By:      */s/ Seth Adam Meinero*
SETH ADAM MEINERO
Trial Attorney (Detailee)
United States Attorney's Office for the
  District of Columbia
D.C. Bar No. 976587
202-252-5847
Seth.Meinero@usdoj.gov

*/s/ Susan Lehr*
SUSAN LEHR
Assistant United States Attorney (Detailee)
United States Attorney's Office for the
  District of Columbia
Nebraska Bar No. 19248
402-661-3700
Susan.Lehr@usdoj.gov

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on November 1, 2021, I served a copy of the foregoing on all parties to this matter as listed in the Court's Electronic Case Files system.

*/s/ Seth Adam Meinero*
SETH ADAM MEINERO
Trial Attorney (Detailee)