UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | No.   21-cr-00041-3 (CJN) |
| DOUGLAS SWEET, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## SENTENCING MEMORANDUM

### Introduction

On November 9, 2021, Mr. Douglas Sweet, pursuant to a guilty plea, will appear before this Court to be sentenced for Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). Mr. Sweet respectfully requests, after considering all the relevant sentencing factors, including 18 U.S.C. § 3553(a), the Court impose a sentence of two years of probation, with the additional conditions of $500 in restitution and 60 hours of community service.

### RELEVANT FACTS AND BACKGROUND

On December 19, 2020, following his loss in the 2020 presidential election, then-President Donald Trump announced a "Save America" rally to protest the results.[1] The rally was set for January 6, 2021, the same date Congress was set to certify Joe Biden as the winner. On the morning of January 6, 2021, attendees gathered at the Ellipse in anticipation of the rally's

---

[1] President Trump announced the rally on Twitter, tweeting, "Big protest in D.C. on January 6th . . . Be there, will be wild!" *See* Dan Barry and Sheera Frenkel, *'Be There. Will Be Wild!': Trump All but Circled the Date,* The New York Times (Jan. 6, 2021), available at https://www.nytimes.com/2021/01/06/us/politics/capitol-mob-trump-supporters.html.

start.[2]  A number of speakers took to the stage, including some high-profile figures in the Republican Party.  Representative Mo Brooks (R-Ala.) urged "American patriots" to "start taking down names and kicking ass."[3]  Katrina Pierson, President Trump's spokesperson during his 2016 campaign, stated, "Americans will stand up for themselves and protect their rights, and they will demand that the politicians that we elect will uphold those rights, or we will go after them."[4]  Amy Kremer, one of the organizers of the "Save America" rally and moderator of the "Stop the Steal" Facebook group, echoed others' calls for Republican lawmakers to challenge the election result and "punch back from Donald Trump."[5]  Lara and Eric Trump, the president's daughter-in-law and son, encouraged the attendees to march on the Capitol to "stand up for this country and stand up for what's right."[6]  Donald Trump, Jr. narrated that "You have an opportunity today: You can be a hero, or you can be a zero. And the choice is yours but we are

---

[2]  Though President Trump boasted that the rally numbered "hundreds of thousands of people", the rally's organizers projected just 30,000 participants.  *See* Andrew Beaujon, *Here's What We Know About the Pro-Trump Rallies That Have Permits*, The Washingtonian (Jan. 5, 2021), available at https://www.washingtonian.com/2021/01/05/heres-what-we-know-about-the-pro-trump-rallies-that-have-permits/.

[3]  *See* Matthew Choi, *Trump is on trial for inciting an insurrection. What about the 12 people who spoke before him?*, Politico (Feb. 10, 2021), available at https://www.politico.com/news/2021/02/10/trump-impeachement-stop-the-steal-speakers-467554.

[4]  *Id*.

[5]  *Id*.

[6]  *Id*.

all watching."[7] Rudy Giuliani, President Trump's personal attorney also spoke, making his now-infamous call for "trial by combat."[8]

Finally, around noon, President Trump took to the stage. For an hour, he bemoaned the election results, imploring attendees to "fight" for him:

> We will not let them silence your voices. . . we're going to walk down to the Capitol, and we're going to cheer on our brave senators and congressmen and women, and we're probably not going to be cheering so much for some of them. . . [if the election is certified], you will have an illegitimate president. That's what you'll have. And we can't let that happen. . . And we fight. We fight like hell. And if you don't fight like hell, you're not going to have a country anymore. . . So we're going to, we're going to walk down Pennsylvania Avenue. I love Pennsylvania Avenue. And we're going to the Capitol, and we're going to try and give.[9]

At approximately 12:30 p.m., even before President Trump concluded his speech, some of the rally attendees migrated from the Ellipse toward the Capitol.[10] At approximately 12:50 p.m., those same attendees breached the outer barricades of the U.S. Capitol grounds.[11] The U.S. Capitol Police officers, who had been stationed behind the barricades, retreated and called for backup from the Metropolitan Police Department (MPD) and National Guard.[12] The MPD

---

[7]    *Id*.

[8]    *Id*.

[9]    *See* Brian Naylor, *Read Trump's Jan. 6 Speech, A Key Part Of Impeachment Trial*, NPR (Feb. 10, 2021), available at https://www.npr.org/2021/02/10/966396848/read-trumps-jan-6-speech-a-key-part-of-impeachment-trial.

[10]   *See* Dmitiy Khavin, et al., *Day of Rage: An In-Depth Look at How a Mob Stormed the Capitol*, The New York Times (June 30, 2021), available at https://www.nytimes.com/video/us/politics/100000007606996/capitol-riot-trump-supporters.html; *see also* Shelly Tan, et al., *How one of America's ugliest days unraveled inside and outside the Capitol*, The Washington Post (Jan. 9, 2021), available at https://www.washingtonpost.com/nation/interactive/2021/capitol-insurrection-visual-timeline/.

[11]   *Id*.

[12]   *Id*.

arrived approximately 15 minutes later, mobilizing and moving from the South of the building to the West. But the National Guard did not respond for nearly four hours, during which time clashes between the first wave of protestors and police intensified.[13]

When President Trump concluded his remarks around 1:00 p.m., a second wave of protestors left the Ellipse and headed toward the Capitol. By the time they arrived, the outer barriers and fencing that had previously surrounded the Capitol grounds were largely displaced, giving them free access to join the first wave of protestors on the steps of the building. Officers were able to hold off the excited crowd for approximately an hour, but at 2:13 p.m., the Capitol itself was breached through a broken window adjacent to the Senate Wing Doors, located on the Northwest side of the building. This breach spurred the evacuation of members of Congress and the Vice President, who at the time, were debating congressional challenges to the Electoral College results.[14]

Following the building's breach, Mr. Sweet along with one of his co-defendants, Ms. Fitchett, entered the Capitol through a door. They found a nearby staircase, and descended it after watching approximately 40 individuals do the same. The staircase led to a corridor ultimately terminating at the Capitol Visitor's Center (CVC). When the pair reached the CVC, a line of officers met them and placed Mr. Sweet, Ms. Fitchett, Mr. Curzio, Mr. Brown, Mr. Rukstales, and Mr. Gallagher, in handcuffs. Mr. Sweet gave no resistance. He was then taken to a local police station, processed, and given a summons to return to D.C. Superior Court. The following day, Mr. Sweet and Ms. Fitchett returned home to Matthews County, Virginia.

---

[13]    *Id.*

[14]    *Id.*

Later on January 7, 2021, a criminal complaint was filed in U.S. District Court for the District of Columbia charging Mr. Sweet with four misdemeanor offenses. *See* ECF No. 1. On January 13, 2021, FBI agents arrested Mr. Sweet. *See* ECF No. 4. An information was then filed on January 15, 2021, formally alleging the charges of (i) Entering and Remaining in a Restricted Building, in violation of 18 U.S.C. § 1752(a)(1); (ii) Disorderly and Disruptive Conduct in a Restricted Building, in violation of 18 U.S.C. § 1752(a)(2); (iii) Violent Entry and Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D); and (iv) Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). *See* ECF No. 7. On January 19, 2021, Mr. Sweet had his initial appearance in U.S. District Court and was released on his personal recognizance with conditions. *See* ECF No. 24. On August 10, 2021, this Court reviewed and accepted Mr. Sweet's guilty plea to count four of the information, and set his sentencing for November 9, 2021. *See* ECF Nos. 83-86. On November 1, 2021, the government submitted its sentencing memorandum asking the Court to impose a sentence of three months of home detention, three years of probation, 60 hours of community service, and $500 in restitution. *See* ECF No. 115.

**LEGAL PRINCIPLES**

Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G), is a class B misdemeanor or "petty offense", as defined by 18 U.S.C. § 3559(a)(7), because it carries a maximum incarceration period of six months or less. The United States Sentencing Guidelines (Guidelines) do not apply to class B misdemeanors. *See* U.S.S.G. §1B1.9. Additionally, pursuant to 18 U.S.C. § 3583(b)(3), the Court is disallowed from imposing a term of supervised release for a petty offense, and if it imposes active, continuous imprisonment, 18 U.S.C. § 3551 seemingly does not support an additional period of probation to

follow. *See United States v. Torrens et. al.*, Crim. No. 21-cr-204 (BAH), ECF No. 110, 113, & 125.

Because the Guidelines do not apply, the Court is directed to look to 18 U.S.C. § 3553(a) to impose a sentence that is "sufficient, but not greater than necessary, to comply with the purposes [of sentencing]." The factors enumerated in 18 U.S.C. § 3553(a)(1) include "the nature and circumstances of the offense and the history and characteristics of the defendant." Additionally, the Court should determine the "need" for the sentence, by considering if and how a term of incarceration would "reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense." *Id*. at (2)(A). Moreover, the Court should consider how a sentence would "afford adequate deterrence to criminal conduct," "protect the public from further crimes of the defendant," and "provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." *Id*. at 2(B-D). Further still, the Court must be mindful of "the kinds of sentences available," should consider "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct," and should consider the "need to provide restitution to any victims of the offense." *Id*. at (3), (6), & (7).

## ARGUMENT

Mr. Sweet, a 59-year-old man with minimal criminal history,[15] is worthy of a probationary sentence in this case. While the nature and circumstances of the January 6 events were indeed serious, his particular actions that day, paired with his individual history and characteristics do not lend itself to a sentence of incarceration or home detention. Rather, a

---

[15]   Mr. Sweet has one 21-year-old misdemeanor conviction for Contributing to the Delinquency of Minor, charges that stemmed from him purchasing alcohol for his 14-year-old daughter.

sentence of probation with community service and restitution would meet the purposes of sentencing, without being overly punitive. A probationary sentence would provide adequate deterrence to Mr. Sweet, avoid an unwarranted sentencing disparity among his co-defendants and other January 6 defendants, and protect Mr. Sweet's ability to provide restitution.

### I. Nature and Circumstances of Mr. Sweet's Offense

The events of January 6 cannot, and should not, be minimized. When protestors unlawfully assembled on the grounds of the U.S. Capitol Building, and later broke through windows and doors, over 100 law-enforcement officers were injured and the U.S. Capitol Building sustained $1.4 million in property damage. Five individuals lost their lives.[16] And because of the breach, the 2020 Presidential Electoral College count was delayed. All of these casualties and disruptions exacted a toll on Americans: some lost family members, some lost friends, and some lost confidence in the American political system's ability to defend against threats to the peaceful transfer of power.

However, Mr. Sweet was not the cause of January 6, nor was he in the classification of people that caused physical harm to the Capitol or others. He entered the building, but his unlawful entrance cannot, and should not, be conflated with the many other, wider, failures that occurred that day. There are a variety of factors that led to the Capitol being breached, including "paralysis" "exacerbated by the patchwork nature of security across a city where responsibilities are split between local and federal authorities" and "driven by unique breakdowns inside each

---

[16]   Ashli Babbitt was killed after she refused to comply with police commands. Kevin Greeson and Benjamin Philips died of unrelated, but perhaps exacerbated, medical conditions while in the crowd. Rosanne Boyland was crushed to death. Officer Brian Sicknick died the day after, from injuries that appear related to his service on January 6. *See* Jack Healy, *These Are the 5 People Who Died in the Capitol Riot*, The New York Times (Jan. 11, 2021), available at https://www.nytimes.com/2021/01/11/us/who-died-in-capitol-building-attack.html.

law enforcement agency."[17]  Additionally, the former president, the rally's organizers and speakers, and nefarious, organized groups contributed to the chaos.  To characterize Mr. Sweet as the proximate cause of January 6 fails to acknowledge these other failures, and places an unjust blame on one non-violent, non-destructive individual.  The American system of justice, and specifically 18 U.S.C. § 3553(a), directs the Court to look at every defendant and every defendant's actions individually.  *See Kimbrough v. United States*, 552 U.S. 85, 90 (2007); *Gall v. United States*, 552 U.S. 38 (2007).

On January 6, Mr. Sweet, upon the urging of President Trump, traveled to Washington, D.C., to protest the results of the 2020 presidential election.  He rode to the nation's capital in a truck with five others from Matthews County, Virginia.  After hearing the president's speech and heeding his call for supporters to "walk down Pennsylvania Avenue," Mr. Sweet marched with thousands of others to the Capitol building.  By the time he arrived, many of the outer barricades and bicycle racks used by officers to cordon off the Capitol grounds were displaced.  Personally, Mr. Sweet met no police resistance to his continual marching toward the Capitol building's steps, though this is likely because by the time he arrived at the building, officers, having already scuffled with the earlier wave of protestors, had retreated to the inside of the building.

At approximately 2:25 p.m., Mr. Sweet walked through a previously breached door of the Capitol, joined with his friend and co-defendant, Ms. Fitchett.  When he entered the building, he collected himself, made sure Ms. Fitchett was with him and unharmed, and took two selfies.  He dishearteningly observed trash covering the floor of the building, presumably left by the

---

[17]    *See* Jacqueline Alemany, et. al., *Before, During, and After Bloodshed*, The Washington Post (Oct. 31, 2021), available at https://www.washingtonpost.com/politics/interactive/2021/what-happened-trump-jan-6-insurrection/?itid=hp-top-table-main.

protestors who entered the building before him.  When he actively observed some individuals engaging in property destruction, he screamed for them to stop.

At 2:33 p.m., Mr. Sweet and Ms. Fitchett walked down a nearby stairway that led to a corridor.  Continuing down the corridor, Mr. Sweet, along with his co-defendants, came upon a line of U.S. Capitol Police Officers at the Capitol Visitor's Center (CVC), who, unbeknownst to Mr. Sweet, were re-grouping from an earlier aggressive show of force by other protestors.[18]  The officers were quick to make arrests, and at approximately 2:39 p.m., just 14 minutes after his initial entry into the building, Mr. Sweet, along with his other co-defendants were placed in handcuffs.

To be clear, Mr. Sweet played no role in organizing the January 6 rally, nor did he deliver inciting and aggressive commentary to the already energized crowd.  He urged no one to "kick[] ass," "go after [politicians]", "punch back from Donald Trump" or engage in "trial by combat."  Additionally, Mr. Sweet did not participate in the forceful breaching of the outer barricades, nor did he participate in the breaching of the inner doors or windows of the U.S. Capitol.  He did not damage or steal any property while inside, and in fact, admonished others from doing so.  He, at no time, assaulted or threatened law enforcement.  Instead, Mr. Sweet's offense conduct that day consisted of him unlawfully assembling at the U.S. Capitol, walking through an already breached door, descending a flight of stairs, walking up to a line of U.S. Capitol Police Officers, and submitting to an arrest of his person.  That offense conduct, and not the offense conduct of others in and around the Capitol that day, should inform this Court's sentencing determination.

---

[18]    Mr. Sweet is not alleged to have been an aggressor in that earlier confrontation.

The government attributes heavy weight to Mr. Sweet's post-January 6 statement to a local news station. During that interview on January 7, Mr. Sweet admitted "he traveled to Washington, D.C., hoping to 'talk to the House and Senate' and realized he might have to 'pretty much force [his] way in.'" ECF No. 115 at 2. However, in the same interview, Mr. Sweet also conveyed, "I didn't go with any malice or intention of malice of those that committed those the fights - the tear gas and just, you know, throwing stuff at police. That wasn't in my game plan at all" and he qualified he had no intention of preventing Congress from certifying the vote.

Later, when the FBI interviewed Mr. Sweet and he was asked about his intentions in going to D.C., he admitted he "had no idea that there was even a possibility of [speaking to members of Congress]. When we went up, we were just going up to see Donald Trump speak. He asked his supporters to come, so we all went. There was no preconception that we would ever be able to go in." Though the government points to Sweet's "agenda" as a reason for the Court to impose home detention, the truth is, he had none. The fact that Mr. Sweet made an earlier, different statement to a local news station is simply not credible, especially when he later disavowed that motivation to federal officers during a formal interview.

Moreover, unlike many January 6 defendant's, Mr. Sweet was arrested the same day as his crime. He was handcuffed and led out of the U.S. Capitol and processed at a police department. Therefore, there was no "cat and mouse" game with law enforcement and the resources required to locate and pursue him were minimal. When he was re-arrested on January 13, Mr. Sweet gave a fully open and compliant interview with law enforcement. Then, in May, when law enforcement asked him to de-brief a second time, he agreed. He shared valuable information about internal strife and movements of extremist groups in the area. In response to his second interview, the government acknowledged that Mr. Sweet "checked the box for a full

debriefing." Further still, when he was asked four days after the second de-briefing to provide his Facebook credentials, he readily complied. In sum, Mr. Sweet has been nothing but fully cooperative and open with law enforcement, and has taken full responsibility for his actions. In asking for home detention, the government fails to clarify why home detention, and not the liberty deprivation inherent with being on supervised federal probation, is necessary. *See United States v. Loy*, 237 F.3d 251, 256 (3d Cir. 2001) ("a condition must involve no greater deprivation of liberty than is reasonably necessary to achieve the deterrence, public protection and/or correctional treatment for which it is imposed.") (internal citations and quotations omitted). Mr. Sweet contends there is no such reason in this case.

## II.     Mr. Sweet's History and Characteristics

Born in 1962, Mr. Sweet was the youngest of three boys from the union of Nancy and George. Growing up on a blueberry farm in Virginia, Mr. Sweet remembers experiencing a childhood full of love and hard work. He jokingly claims that he and his brothers worked as "indentured servants" of his parents. His dad, an aeronautical engineer at NASA, regularly took his boys to watch rocket launches. His mom, who worked in real estate, always found time for her children. Mr. Sweet loved hunting, spending time in the woods, and perhaps partly due to his science-driven father and a fascination with how things work, digging for artifacts.

In 1980, Mr. Sweet graduated from Matthews High School, which is also where he met his long-time friend and co-defendant, Ms. Fitchett. In 1984, he married his wife, Deborah, a marriage that lasted 10 years and produced two daughters, Robyn and Renee. However, in 1992, Mr. Sweet, working as chief engineer on a tug-boat, was given word that his wife, whom he trusted to care for his daughters in his absence, was abusing drugs and alcohol. According to Mr. Sweet, he learned his wife was leaving the small children (then two and seven-years-old) to fend

for themselves, and when she was around the children, she was highly intoxicated. Mr. Sweet, upon learning of this crisis, left his tug-boat job and made his way back home. Sure enough, he confirmed his wife was actively using cocaine around the children. He immediately petitioned the courts in Virginia for full legal and physical custody of the girls. In 1994, Mr. Sweet and his wife separated, but it took more years and thousands of dollars in legal fees for the State of Virginia to finally award Mr. Sweet full custody and dissolve the marital union.[19] At 36 years old, Mr. Sweet became a single father to two young girls.

      To support his daughters, Mr. Sweet took any and every job he could get. He first worked in construction and then, after earning his welding certificate, worked as a handyman for different marinas in Deltaville and Newport News, Virginia. He lived paycheck to paycheck, but was able to see his daughters through to adulthood and purchase a humble home on Gwynn's Island, a sleepy fishing community off the eastern shore of Virginia. In 2011, his mother, 80 years old at the time, began to decline in health. By that point, Mr. Sweet's father had been deceased for decades from liver cancer. Mr. Sweet decided that, with his two daughters now grown, and with a lackluster response from his brothers, he needed to be the one to step in and care for his mother. He stopped working at the marinas and picked up odd jobs around Matthews County to remain close to his mother's home, including cutting grass and firewood.

      Mr. Sweet cared for his mother until her death this past August when she suffered a severe brain hemorrhage. He misses his mother dearly, but remains a gregarious, lively, and warm individual who desperately wants to care for others. This is evidenced by his fight to gain custody of his two young daughters, his dutifulness in caring for his aging mother, his service to

---

[19] Mr. Sweet believes his long battle was partially due to a lack of precedent of a father raising two children on his own.

his church, and his willingness to lend a hand to fellow community members.[20]  In sum, Mr. Sweet's history and characteristics support a probationary sentence.

### III. A Sentence of Probation Would Not Create An Unwarranted Sentencing Disparity

Sentencing Mr. Sweet to probation would not contribute to an unwarranted sentencing disparity, but sentencing him to *anything other* than probation, might.  Though many of the January 6 cases are unresolved, the Court can look to other sentencing judgments to gain a baseline.  January 6 defendants in other cases who pled to the *exact* same criminal charge with the *same* minimal criminal history have received probationary sentences.  *See United States v. Anna Morgan-Lloyd*, Crim. No. 21-cr-00164 (sentenced to 36 months' probation); *United States v. Valerie Ehrke*, Crim. No. 21-cr-00097 (36 months' probation); *United States v. Danielle Doyle*, Crim. No. 21-cr-00324 (2 months' probation); *United States v. Eliel Rosa*, Crim. No. 21-cr-00068 (12 months' probation); *United States v. Vinson, et al.*, Crim. No. 21-cr-0355 (5 years' probation).

Additionally, Mr. Gallagher, Mr. Sweet's co-defendant, who was sentenced on October 13, 2021 for the same crime, received two years of probation, community service, and a restitution order.  While there are always differences in criminal cases, the differences between Mr. Gallagher and Mr. Sweet are minimal.[21]  Mr. Sweet and Mr. Gallagher entered the U.S. Capitol Building around the same time, descended down the same staircase, walked down the same corridor, and made contact with the same group of officers.  Both admonished other protestors from committing violence and property damage.  Both were placed in handcuffs at

---

[20]  *See* Ex. A: Character Letters from Ed Jordan, Tyrone Hudgins, and Renee Randall.

[21]  This Court accounted for Mr. Gallagher's past civil service and found it, "cut both ways" since, in essence, his role as a civil servant meant he should have known better.

identical times and led from the Capitol into the same police vehicle that took them to the same police station for processing.  Mr. Gallagher and Mr. Sweet both have no substantive criminal history and both took responsibility for their actions.  While Mr. Sweet may be more outspoken in his political views than Mr. Gallagher, he was also more cooperative with investigators by agreeing to two different de-briefing sessions and voluntarily giving over his social media passwords.  Simply put, to sentence Mr. Sweet differently than Mr. Gallagher and other January 6 defendants who pled to the same offense and have the same criminal histories, would *lead to* an unwarranted sentencing disparity, in stark contrast to the factors dictated in 18 U.S.C. § 3553(a)(6).

IV. **Mr. Sweet's Ability to Pay Restitution is Directly Related to His Ability to Work**

Finally, 18 U.S.C. § 3553(a)(7), provides that a Court must account for whether a proposed sentence would impact the ability of the defendant to provide restitution to the victim of the offense.  As part of his plea agreement, Mr. Sweet has agreed to pay $500 to the Architect of the Capitol, even though he was not personally responsible for any damage to the building, and even though he admonished others from committing vandalism.  Agreeing to that amount of money is a significant commitment for Mr. Sweet since his vocations are cutting local neighbors' lawns in the summer and firewood in the winter, jobs that cannot be done remotely and jobs he cannot take a leave of absence from and continue to be compensated.  In fact, according to statements in his presentence report, paying $500 in restitution means he will have to forgo a full month of income.  Incarcerating him or placing him on home detention will only increase the amount of time Mr. Sweet will need to make these payments, which will not serve the interests of the victim in this case since according to the government, $1.4 million has already been expended to repair damage done on January 6.

**Conclusion**

January 6, 2021 was a horrifying day for many who watched it unfold, whether on television or in-person. But Mr. Sweet, despite his presence within the crowd, was not a malicious actor who engaged in the outrageous conduct for which the day will be remembered. He did not organize or incite the riot, nor did he physically harm any person or property. And though Mr. Sweet certainly deserves some punishment for his conduct, it must be weighed against his lack of criminal history, his other history and characteristics, his individual actions on January 6, the non-incarceration sentences imposed on those who engaged in similar conduct, and his ability to timely pay restitution. Considering these and other § 3553(a) sentencing factors, a two-year probationary sentence, restitution in the amount of $500, and 60 hours of community service is sufficient, but not greater than necessary, to satisfy the purposes of sentencing.

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

_____/s/_____
CARA HALVERSON
Assistant Federal Public Defender
625 Indiana Ave. NW, Ste. 550
Washington, D.C. 20004
(202) 208-7500
Cara_halverson@fd.org